UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE WHITE HOUSE SERVICES,
(Edwin Broadus),

        Plaintiff,

vs.

ALLSTATE INSURANCE CO.,

        Defendant.
_____/

Case No. 17-CV-12672

HON. GEORGE CARAM STEEH

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [ECF No. 42]

Plaintiff, The White House Services, provides medical services to Edwin Broadus, who sustained catastrophic brain injuries in a motor vehicle collision occurring November 1, 1982. In this action, plaintiff seeks to collect no-fault personal protection insurance benefits from defendant Allstate Insurance under Michigan's No-Fault Automobile Insurance Act ("No-Fault Act" or "Act") and an automobile insurance policy. Specifically, plaintiff seeks to recover for services provided to Mr. Broadus while he was a resident in a single person apartment from January 21, 2016 through January 31, 2018.

The matter is presently before the court on defendant's motion for summary judgment. Defendant argues that plaintiff did not provide lawfully

rendered services to Mr. Broadus for which it is entitled to Michigan no-fault benefits. Specifically, defendant alleges that plaintiff did not possess the required license to provide adult foster care services in a single apartment setting and therefore its services are not compensable under the No-Fault Act. Oral argument was heard by the court on October 7, 2019.

## FACTUAL BACKGROUND

The White House Services is owned by Jacquelyn Vaughn. She started operating The White House Services in 2006 by offering geriatric in-home services and then transitioned into offering services for people who suffered traumatic brain injuries in motor vehicle accidents. The White House Services is licensed as an adult foster care home for services provided at 5466 Greenbriar ("Group Home") and is restricted to having six clients at a time at the home.

The White House Services also offers a "residential program" for individuals who live offsite. In 2012, the Michigan Department of Human Services Bureau of Children and Adult Licensing ("Department") undertook an investigation into The White House Services. The investigation focused on the services provided to "Resident A" who lived in one of plaintiff's single person apartments. On April 23, 2012, the Department concluded that adult foster care was being provided to Resident A at the apartment without

a license. The Department also found that "Resident A's care plan is directed towards total rehabilitation, full independence and eventual release from the support of the servicing insurance company." PageID 825. After concluding that Resident A did not require the adult foster care services normally provided by plaintiff's Group Home, the Department directed Ms. Vaughn to form a new entity to service rehabilitative clients who are working toward independent living. This new entity was White House Custom Services, and its purpose was "[t]o clarify the differences [between adult foster care services provided by the Group Home and rehabilitative services provided in the single apartment setting], avoid the appearance of impropriety and maintain services and funds apart from the licensed group home . . . ." PageID 825. The Department required a doctor's statement supporting a high probability for rehabilitation in order for rehabilitative services to be provided in the single apartment setting without a license. Following the investigation, Vaughn established The White House Custom Services as the entity that services "[a]ny future business outside White House Services group home . . . ." PageID 825.

Vaughn affirmed in her deposition that The White House Services' adult foster care license does not cover the services provided offsite for the residential program. (Vaughn Dep., p. 19). Susan Schmidt is the

accountant for The White House Services and The White House Custom Services.  Schmidt explained that the two entities file joint tax returns and the accounts receivable for the two entities are commingled.  Further, the staff providing the services is shared by the two entities.  In their depositions, plaintiff's employees often referred to the two entities generally as "The White House".

On January 21, 2016, Edwin Broadus moved into a single resident apartment located at 29700 Citation Circle, Farmington Hills, Michigan (the "Citation Circle Apartment").  The rent for the apartment is included in the per diem rate plaintiff charged for services provided to Broadus.  Plaintiff identified employees Dara Ladd and Mia Banks as Broadus' two primary caregivers.  Ladd provided services at the Citation Circle Apartment on Mondays through Fridays from 8:00 a.m. to 4:00 p.m.  These services included: attending Broadus' medical appointments; preparing meals with food purchased by The White House; administering medications; assisting while out in the community; ensuring someone at The White House is aware of his whereabouts; overseeing dressing and hygiene; assuring his health, safety and well-being; and protecting him against physical harm, humiliation and intimidation.  These services were offered and available to Broadus 24 hours a day, seven days a week.  Ladd further explained that

Broadus spent nights at the Citation Circle Apartment but regularly went to the Group Home during the day, so he could interact with other clients.

Mia Banks testified she provided services to Broadus on Monday, Wednesday and Friday from 4:00 p.m. to 9:00 p.m. at the Citation Circle Apartment. During her shift she provided the following services: assistance with showering, dressing and hygiene; meal preparation; administering medications; activities such as taking walks and going out in the community; reminding him of activities to be completed; protecting his health, safety and well-being; and making sure someone from The White House always knows of his whereabouts.

Paulette Boggs is the human resources and account manager for The White House. She confirmed that The White House is always aware of Mr. Broadus' whereabouts, and that services are available to him 24 hours a day, seven days a week. As a rule, caregivers were to provide assistance with: meal preparation; activities of daily living; dressing in proper clothing; development of personal and social skills; and ensuring his health, safety and well-being.

The caregivers document the services they provide on records that comprise each resident's chart. For Mr. Broadus, these records document the following services: grooming support; administration of medications;

preparation of meals; assessments regarding behavior; household chores; and attendance at doctor appointments. Plaintiff produced records titled "Rolling Rehab Recreation," which show that caregivers provided "social integration activity" for Mr. Broadus. This includes taking Broadus on outings in the community, so he could work on developing personal and social skills.

The job description for Care Specialist/Home Health Aide at The White House Services lists the following services provided to clients: medication reminders; escorts to appointments; meal planning and preparation; assistance with bathing, dressing and grooming; running errands; and engaging in physical and mental exercise. Each of these services was provided to Mr. Broadus.

Plaintiff seeks to recover for services provided to Mr. Broadus while he was a resident at the Citation Circle Apartment from January 21, 2016 through January 31, 2018. Mr. Broadus moved into the Group Home on February 1, 2018 and the parties agree that defendant has paid plaintiff for services provided and billed since that date. Defendant moves for summary judgment, contending that plaintiff is not entitled to reimbursement under the No-Fault Act because it was operating as an unlicensed adult foster care facility and was therefore not lawfully rendering

treatment under Michigan's No-Fault Act. Plaintiff responds by arguing that defendant has not offered any proof that The White House Custom Services was required to have a license under the Adult Foster Care Facilities Licensing Act to lawfully provide its services and accommodations to Mr. Broadus in a single apartment setting.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Tolan v.* Cotton, 572 U.S. 650, 660 (2014); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*,

477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

ANALYSIS

It is uncontested that neither The White House Services nor The White House Custom Services has a license to provide adult foster care at the Citation Circle Apartment. It is also uncontested that the services provided to Mr. Broadus at the apartment meet the definition of foster care. The issue for this court to decide is whether a license was required for plaintiff to provide adult foster care to Mr. Broadus at the Citation Circle Apartment. Stated another way, did the Citation Circle Apartment met the statutory definition of adult foster care facility? If that is the case, then the services provided by plaintiff at the single resident apartment were not lawfully rendered treatment under the No-Fault Act and therefore are not compensable. *Healing Place at N. Oakland Med. Ctr. v. Allstate Ins. Co.*, 277 Mich. App. 51, 57-58 (2007). It is plaintiff's burden to prove that the services it provided are compensable. *Id.* at 57.

Michigan's Adult Foster Care Facilities Licensing Act ("AFCFLA"), MCL 400.701 et seq. requires a license to operate an adult foster care facility. An "adult foster care facility" is defined as:

> [a] governmental or nongovernmental establishment that provides foster care to adults. Subject to section 26a(1), adult foster care facility includes facilities and foster care family homes for adults who are aged, mentally ill, developmentally disabled, or physically disabled who require supervision on an ongoing basis but who do not require continuous nursing care.

MCL 400.703(4). The AFCFLA further requires that "[a] person, partnership, corporation, association . . . shall not establish or maintain an adult foster care facility unless licensed by the department." MCL 400.713(1). Further, "[a] license shall be issued to a specific person for a facility at a specific location and is nontransferable." MCL 400.713(7).

Under the No-Fault Act, personal protection insurance benefits are payable for all "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." MCL 500.3107(1)(a). The section of the No-Fault Act addressing the amount that can be charged for treatment provides:

> A physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance . . . may charge a reasonable amount for the products, services and accommodations rendered.

MCL 500.3157.

The Michigan Court of Appeals has read section 3107 in conjunction with section 3157 to conclude that "the Legislature intended that only treatment lawfully rendered, including being in compliance with licensing requirements, is subject to payment as a no-fault benefit." *Healing Place,* 277 Mich. App. at 57 (citing *Cherry v. State Farm Mut. Automobile Ins. Co.*, 195 Mich. App. 316, 320 (1992)); accord *Perrin v. State Farm Mut. Auto Ins. Co.*, 2019 U.S. Dist. Lexis 100506, Eastern District of Michigan Southern Division, Case No. 17-cv-10558, (June 25, 2109) (Court reviewed serviced offered by plaintiff to determine if a license was required under AFCFLA and, if so, affirmed it would be fatal to the provider's no-fault claim).

Plaintiff argues that it is not required to have a license for its single resident apartments because the AFCFLA uses the plural "adults" in its definition of an adult foster care facility. MCL 400.713(4). According to plaintiff, a single resident apartment cannot be covered by the definition of an adult foster care facility, and therefore is not required to be licensed, if it is only providing services to a single adult. In support of this position, plaintiff attaches the Affidavit of Gregory J. Bator, an attorney whose practice includes licensing matters under the AFCFLA. Mr. Bator states that he is not aware of the State of Michigan, Department of Licensing and

Regulatory Affairs ("LARA") concluding that a facility or provider is required to have a license to provide adult foster care services when such services are provided to a single individual in a single-person residence. (Bator Aff., ¶ 3)

Attorney Bator describes a specific investigation in which LARA initially determined that Innovative Lifestyles, a provider of adult foster care services to a single person in a single residence, was required to have a license, but then reversed itself and determined that a license was not required. The basis of LARA's ultimate determination in that case was that providing care to one resident in a single residence does not meet the definition of adult foster care facility since care is not being provided to multiple "adults". MCL 400.703(4) provides that a license is required under AFCFLA when adult foster care services are provided to "adults." (Bator Aff., ¶ 4) Bator contends that "[i]n choosing to pluralize the word 'a*dults*,' it is clear the Legislature intended the requirement to only apply to situations in which services that constitute adult foster care services were being provided to more than one individual in a given setting or residence." (Bator Aff., ¶ 4)

Attorney Bator does not discuss the Department's previous investigation of The White House Services in 2012. The Department found

a violation of AFCFLA where The White House Services was a licensed facility providing adult foster care services to an individual at a single resident apartment for which it did not have a license.  This is precisely the situation presented with Mr. Broadus.  After finding the violation, the Department require that Jacquelyn Vaughn distinguish the care being provided at the licensed adult foster care facility from the care being provided to individuals in single apartment residences by creating a separate corporation, The White House Custom Services, and that "any future business outside White House Services group home will be serviced by this entity."  The Corrective Action Plan made it clear that the new entity is designed to service rehabilitative clients working toward independent living.  "The criteria will be a doctor's statement that concludes a high probability for rehabilitation."  (Defendant's Exhibit K)

The 2012 State investigative report focused on the care being provided and concluded that The White House Services met the definition of providing foster care.  Instead of revoking plaintiff's license or requiring the single-bed apartment to be licensed, the Department offered a Corrective Action Plan which permitted plaintiff to provide rehabilitative services, not qualifying as adult foster care services, to individuals in the single resident apartments.  However, the evidence presented in this case

demonstrates that The White House Custom Services is not maintained as a separate entity from The White House Services. Furthermore, Mr. Broadus is not a client who is expected to return to full independence. Plaintiff agreed that Mr. Broadus received foster care services in the apartment setting.

The Michigan Court of Appeals addressed a situation similar to the one before this court in *Keys of Life v. Auto-Owners Ins. Co.*, 2016 WL 7493759 (Dec. 27, 2016) (unpublished). In *Keys of Life*, plaintiff began providing adult foster care services to Mr. Mowrer in a licensed group home before moving him to an apartment leased for him as part of its residential apartment program. Plaintiff did not have a license to operate the apartment as an adult foster care facility. The insurance company defendant argued that plaintiff was not entitled to reimbursement for 24-hour attendant care under the No-Fault Act because it was not licensed to provide adult foster care in the single apartment setting and was thus not lawfully rendering treatment under the act. The court undertook the analysis laid out in *Healing Place* and concluded that plaintiff was providing adult foster care services to Mr. Mowrer in the residential apartment. As such, the apartment facility was required to be licensed as an adult foster care facility. *Id.* at *4.

Plaintiff urges the court to defer to the interpretation of the administrative agency charged with enforcing the statute at issue. However, the standard of review for questions of statutory construction provides that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative construction which are contrary to clear congressional intent." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 447-48 (1987) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).

The court starts its analysis with the text of the AFCFLA, looking to the structure and language of the statute and the context in which that language is used. The title of Section 400.701 of Michigan's Social Services statute is the "Adult Foster Care Facility Licensing Act". Other Sections of the statute address "Youth Adults"[1], and still others deal with children[2]. A rational explanation for why the definition section uses the word "adults" in defining an "adult foster care facility" is to distinguish such facility from one providing care to children or to youth adults. MCL 400.703(4).

---

[1] "Youth" in this Section is defined as an individual who is at least 18 years of age but less than 21 years of age. MCL 400.643(c).
[2] See e.g., MCL 400.18c.

Plaintiff's proposed reading of the word "adults" is further undermined at the end of the definition, which lists categories of facilities that are not adult foster care facilities. The statute excludes certain nursing homes, hospitals, infirmaries, child caring institutions, foster family homes, and establishments providing alcohol or substance use rehabilitation or mental health services. MCL 400.703(4)(a) – (k). Importantly for purposes of this analysis, the list does not exclude single resident dwellings from the definition of adult foster care facility just because they house a single adult. Furthermore, in the case of a private residence with the capacity to receive one to four adults who all receive benefits from a community mental health services program, in order to be excluded from the definition of adult foster care facility there is the additional requirement that the services provided be monitored by the community health services program.[3] The common requirement is that where certain services are being provided, the legislature requires monitoring by an appropriate agency.

The court finds that the LARA decision relied on by plaintiff is contrary to clear congressional intent and therefore is not binding on this court.

---

[3] MCL 400.703(4)(k) excludes "[a] private residence with the capacity to receive at least 1 but not more than 4 adults who all receive benefits from a community mental health services program if the local community mental health services program monitors the services being delivered in the residential setting."

Consistent with Michigan caselaw, the Citation Circle Apartment meets the definition of an adult foster care facility based on the services provided to Mr. Broadus at the apartment. Plaintiff was therefore required to be licensed to provide adult foster care services at the Citation Circle Apartment. Because plaintiff was not licensed, the services provided to Mr. Broadus were not lawfully rendered as required by the No-Fault Act.

Plaintiff argues that it provided other non-foster care services to Mr. Broadus, such as "rehabilitative therapies, social integration activities, and other life care and support services," for which it should be paid. Plaintiff requests time for additional fact-finding determine whether a portion of the per diem rate billed relates to recoverable services. However, the testimony of plaintiff's employees supports a finding that these other services fall within the definition of foster care. For example, taking clients out into the community to go to church or the library so they can work on their communication skills meets the definition of "personal care" under AFCFLA which includes "the development of those personal and social skills required to live in the least restrictive environment." MCL 400.706(1). Furthermore, it is undisputed that Mr. Broadus does not have a high probability for rehabilitation from his catastrophic brain injuries. The court

concludes that further discovery is not warranted under the circumstances presented in this case.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is GRANTED.

Dated: October 15, 2019

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on October 15, 2019, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk